**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| JOHNNY LEE TALLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:06-cv-02014-RBP-JEO |
| | ) | |
| DR. BOSSERMAN, DR. MARC SONNIER, | ) | |
| DEBORAH BERRY, PRISON HEALTH | ) | |
| SERVICES, and SHALA [POURSAIED], | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

The plaintiff, Johnny Lee Talley, is an inmate formerly confined in the Alabama penal

system at the Hamilton A&I Correctional Facility and the Limestone Correctional Facility who

filed this pro se action pursuant to 42 U.S.C. § 1983.  The plaintiff alleges that he has been

deprived of rights, privileges, or immunities afforded him under the Constitution or laws of the

United States of America and names as defendants, Dr. Michael Bosserman, Dr. Marc Sonnier,

Shala Poursaied (Certified Registered Nurse Practitioner ("CRNP")), Deborah Berry (Registered

Nurse ("RN")), and Prison Health Services.  He alleges that he has been denied adequate medical

care in violation of the Eighth Amendment and claims that his rights under the Americans with

Disabilities Act, 42 U.S.C. §§ 12101 *et seq*., have been violated.  (Doc. 1 (Complaint) and Doc. 8

(Amended Complaint)).[1]  As compensation for the alleged constitutional violations, the plaintiff

seeks declaratory and injunctive relief, as well as, compensatory and punitive damages.  *Id*.

**I.  PROCEDURAL BACKGROUND**

Premised on the plaintiff's allegations in the amended complaint, the Court entered an

_____

[1]References herein to "Doc. ___" are to the document numbers assigned by the Clerk of the Court.

Order for Special Report, directing that copies of the amended complaint in this action be
forwarded to each of the named defendants and requesting that they file a special report
addressing the plaintiff's factual allegations and claims.[2]  (Doc. 9).  The Court articulated the
plaintiff's claims as follows:

1.      The plaintiff claims that the defendants failed to provide him adequate
        medical care for a severe neck and back injury he suffered in an
        automobile accident while being transported to court.

2.      The plaintiff claims that the defendants refused to renew his "no work" profile
        which was in place because of his back and neck problems prior to the accident
        and new injuries.

*Id*. at pp. 2-3.  The defendants were advised that the special report could be submitted under oath
or accompanied by affidavits and, if appropriate, would be considered as a motion for summary
judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  By the same Order,
the plaintiff was advised that after he received a copy of the special report submitted by the
defendants he should file counter affidavits if he wished to rebut the matters presented by the
defendants in the special report.  The plaintiff was further advised that such affidavits should be
filed within twenty (20) days after receiving a copy of the defendants' special report.  *Id*.

        The plaintiff then filed a motion to amend his pleading and add a claim that the
defendants did not implement the medical treatment recommended by Dr. Lyerly on August 24,
2006, for helilobalter pylroi.  (Doc. 12 at p. 4).  This treatment included antibiotics and "a proton
pump inhibitor and sometimes a bismuth containing medication."  *Id*.  The plaintiff filed a

---

[2]Throughout his amended complaint, the plaintiff references exhibits and statements made in his original complaint.
When the plaintiff was ordered to amend his complaint, he was informed that he must include everything in his amended
complaint and not refer the Court to other documents including his original complaint.  The defendants were provided copies of
the plaintiff's amended complaint and were directed to respond to the allegations made in the amended complaint.  (Doc. 8).
They were not provided a copy of the original complaint.

second motion to amend seeking to add "Nurse Brown and Nurse Smith" due to their purported failure to report Dr. Sonnier's "unprofessional and vicious actions which were inflicted upon the plaintiff."  (Doc. 13 at p. 2).  He further asserts that Brown and Smith instead conspired with Sonnier to "cover it up."  *Id*.  In his third motion to amend, he noted that the Court failed to list PHS as a defendant and that the Court failed to enumerate his harassment and retaliation claims. (Doc. 14).

On March 23, 2007, he filed another motion seeking an immediate injunction preventing his transfer to another institution and requesting that he be provided "outside" medical care only. (Doc. 15).  On the same day, he filed a motion seeking an immediate injunction to be placed and remain on "no work status."  (Doc. 16).

On May 8, 2007, the defendants filed a special report accompanied by copies of applicable portions of the plaintiff's medical records and the affidavits of Dr. Michael W. Bosserman, Dr. Marc Q. Sonnier, Shala Poursaied, CRNP, and Deborah Berry, RN.  (Doc. 20). Thereafter, the plaintiff was notified that he would have twenty (20) days to respond to the motion for summary judgment, filing affidavits or other material if he chose.  The plaintiff was advised of the consequences of any default or failure to comply with Fed. R. Civ. P. 56.  *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

On June 11, 2007, the plaintiff filed a pleading, including affidavits, in support of a claim of "harassment, retaliation and reprisal and the illegal censoring of plaintiff's legal mail."  (Doc. 26).  On June 25, 2007, he filed a response to the defendants' motion for summary judgment. (Doc. 26).

The plaintiff filed various discovery motions and a request for an independent physical

examination and a stay of the Court's consideration of the motion for summary judgment.  (Doc. 23, 27 & 30).  The motions were denied by the magistrate judge assigned this matter.

Most recently, the plaintiff has filed a motion to conduct additional discovery to obtain all missing records from various health professionals.  (Doc. 32).

## II.  SUMMARY JUDGMENT

### A.  STANDARD

Because the special report of the defendants is being considered a motion for summary judgment, the Court must determine whether the moving party, the defendants, are entitled to judgment as a matter of law.  Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *Federal Rule of Civil Procedure 56*.  In making that assessment, the Court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc*., 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law.  *See Celotex*

4

*Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).  As the

Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted].  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

## B.  DISCUSSION

### 1.  Background to the Plaintiff's Present Claims

Applying the above standard to the facts before the Court, the following facts are

undisputed or, if disputed, are taken in a light most favorable to the plaintiff.  In his amended

complaint, the plaintiff names only medical personnel at Limestone Correctional Facility as

defendants, but provides background information about an incident in Etowah County to support

his claim that he has serious medical needs for which he requested and was denied adequate

medical care.  (Doc. 8).  In response, the defendants submitted almost three hundred pages of the

plaintiff's medical records and the affidavits of the doctors and nurses who responded to the

plaintiff's numerous and varied requests.  (Doc. 20).

On July 13, 2004, during an initial inmate medical screening at the Marshall County Jail,

the plaintiff reported that he had chronic back and neck pain, had undergone back surgery in

1995 and 2002, and was taking Lortab, Soma, and Klonopin among other prescribed drugs.

(Doc. 20, Medical Records[3] at pp. 74 & 77).  A notation made on the medical progress notes states that the plaintiff demanded to go to the hospital at the outset of his incarceration at the Jail. *Id*. at p. 77.  He also wanted his Lortab, which was not permitted in the Jail.  *Id*.  An hour later, the plaintiff complained of chest pain and was upset when he was told he would not be given Lortab, Soma, or Klonopin while incarcerated.  *Id*.  The plaintiff became belligerent with the booking officer when those drugs were refused.  *Id*.  Later in the afternoon, the plaintiff reported that he fell out of the top bunk.  *Id*.  He was examined.  During the examination, he demanded to be taken to the emergency room at a local hospital.  *Id*. at p. 78.  The examining medical professional noted that the plaintiff had been stating throughout the day that "he would be going to the hospital one way or another."  *Id*.  The next day, the plaintiff was still upset about not being allowed narcotics in jail and requested to be put on detoxification medications.  *Id*. at p. 73.

In November 2004, medical personnel at the Department of Corrections had identified the plaintiff as "drug seeking" in their progress notes.  *Id*. at p. 103.

On May 20, 2005, the plaintiff, though incarcerated in the Limestone Correctional Facility ("LCF"), was being transported to court in an Etowah County Sheriff's Department vehicle when the vehicle was involved in an accident.  (Doc. 8 at attached p. 1).  The plaintiff sustained injuries to his neck and lower back.  *Id*. at p. 2.  The plaintiff continued to request medical treatment for eight and one half hours after the wreck before it was provided.  *Id*.  At the time he was finally examined, the plaintiff's blood pressure was very high and he was in severe pain.  *Id*.[4]  He refused a muscle relaxer for pain and continued to request an examination in the

---

[3]The medical records are located at document 20-2 to 20-7 in the Court's electronic filing system.  Page references are to the "Bates" stamp numbers found on each page.

[4]A copy of the supporting medical record is attached to the plaintiff's amended complaint.

emergency room for alleged whiplash.[5]

## 2. The Present Claims

The plaintiff was transported back to LCF on May 26, 2005.  (Doc. 8 at attached p. 3).

Immediately upon his return, he requested emergency medical treatment for severe pain.[6]  *Id*.

Emergency care was denied and the plaintiff was told to sign up for sick call.  *Id*. at pp. 3-4.  He

was examined by Nurse Smith two weeks later at sick call and was referred to Bosserman.  *Id*. at

p. 4.  The plaintiff contends that Smith's referral to the doctor rather than taking immediate

action when she examined him violated his constitutional rights and his rights under the

Americans with Disabilities Act ("ADA").[7]  *Id*.

Two weeks later, the plaintiff was called to the infirmary and seen by Nurse Practitioner

Shala Poursaied.  *Id*. at p. 5.  He requested a referral to a neurosurgeon, pain medication, and the

renewal of his "no work" profile.  His requests were all denied by Poursaied.  *Id*.  He filed a

grievance in which he complained about the actions of Poursaied.  On June 13, 2005, Poursaied

requested a radiology study on the plaintiff.  The study was performed on June 16, 2005, by a

board certified radiologist who found only mild degenerative changes in his lumbar vertebrae.

(Doc. 20, Medical Records at p. 247).

On July 7, 2005, the plaintiff was seen again by Poursaied after he wrote the warden

complaining about his medical care.  Poursaied again denied the plaintiff's request for a referral

---

[5]The plaintiff provides no other details of the treatment he received or the injury he sustained.  Additionally, the Court notes that the plaintiff further asserts that he has rheumatoid arthritis, diabetes, and has a twenty-five year history of hypertension.  (Doc. 1 at Attachment ¶ 1).

[6]The defendants dispute this, stating that he simply "filled out a Sick Call Request complaining of neck and back pain" as a result of the accident.  (Doc. 20, Medial Records at p. 126).

[7]Nurse Smith was not named as a defendant in this lawsuit.

to a neurosurgeon or the renewal of his "no work" profile and merely gave him an over-the-counter pain medication.  (Doc. 8 at p. 6).  The plaintiff maintains that Poursaied violated his constitutional rights and his rights pursuant to the ADA when she refused his requests.  *Id.*

On July 18, 2005, he was seen by Bosserman.  His request to see a neurologist was denied, as was his request for stronger medication.  *Id.* at p. 7.  According to the plaintiff, when he complained to Bosserman about the pain, Bosserman stated "that's aright [sic] because you're a prisoner."  *Id.*  Bosserman then allegedly "upgraded Talley's 'no work' profile, which forced him to be assigned to the yard crew" endangering his health or forcing him to face disciplinary action for refusing to work.[8]  *Id.*

The plaintiff repeatedly filed medical grievance forms and wrote letters to the warden, the medical unit, and others requesting a referral to a neurosurgeon and an MRI.  The defendants continually denied his requests.  *Id.* at p. 10.  On July 31, 2005, he sent a letter to Dr. Willard Mosier, the Corporate Director of P.H.S.  According to the plaintiff, he ignored his "cry's [sic] for help."[9]  *Id.* at p. 9.

The plaintiff was seen by Bosserman on August 29, 2005.  The physician's notes state that the plaintiff complained of neck pain and was requesting a "no work" profile and an MRI. (Doc. 20, Medical Records at p. 105).  Following an examination, Bosserman concluded that the plaintiff's work profile was "restrictive enough."  *Id.*  He further found that although the plaintiff

---

[8]The plaintiff further alleges that this action was contrary to Bosserman's January 20, 2005 evaluation where he stated that the plaintiff's special needs profile include "no work."  *Id.* at p. 8.

[9]The medical records, however, show that the plaintiff was seen on August 2, 2005, for neck and back pain.  The medical staff's examination revealed that he had tenderness in his cervical vertebrae and other mild symptoms.  He was given a muscle relaxant.  (Doc. 20, Medical Records at p. 121).  He was again seen on August 8, 2005, for the same problem.  The staff discussed his lab values with him and continued him on his medication.  *Id.* at p. 19.

had some arthritic changes, which were demonstrated in an X-ray, there were no neurological changes. The plaintiff was continued on his existing work profile and prescription for pain relief. *Id*.

The plaintiff was examined by Bosserman again on October 3, 2005, in the chronic care clinic with the same neck and back complaints. *Id*. at p. 17. Bosserman noted that the physical examination of the plaintiff was "inconsistent with significant neck or back pain." *Id*. He also noted that the plaintiff was overweight and needed to try and lose some weight. *Id*. Bosserman did not order an MRI, but did continue the plaintiff's visits to the nurse practitioner. *Id*.

The plaintiff filed a grievance on September 26, 2005. When he did not receive a response, he sent a letter to Warden Wise on October 4, 2005. He filed another grievance on October 14, 2005, seeking an MRI. (Doc. 8 at p. 10). On October 17, 2005, Mrs. Berry, the department head, responded to the plaintiff's grievance by telling him that he did not qualify for an MRI "for various reasons." *Id*. He filed an appeal concerning this grievance. He also challenged the fact that his "no work" profile was not being continued. *Id*. at p. 11. The response stated that his "no work" profile was in place until January 2006 and referred the plaintiff to the response to the October 14, 2005 grievance concerning the MRI. It also noted that the plaintiff had an appointment with Bosserman for evaluation and treatment. *Id*. and Doc. 1, Attachment 15.

On November 17, 2005, the plaintiff filed another grievance form because the appointment with Bosserman was cancelled and rescheduled for a later date. Am. Comp. at p. 12.

On December 5, 2005, the health staff modified the plaintiff's work profile to restrict his

work to standing for no longer than twenty minutes.  (Doc. 20, Medical Records at p. 53).  The new profile was for a period of six months.  *Id*.

On December 16, 2005, Bosserman saw the plaintiff after he completed a sick call slip the pervious day.  The plaintiff again complained of neck and back pain from the accident and requested a MRI for accurate diagnosis of his situation.  *Id*. at p. 120.  The staff noted tenderness in the plaintiff's cervical and lumbar vertebrae.  Their plan of care included that the plaintiff not work in jobs that required standing for longer than twenty minutes and that he return to the clinic in eight weeks.  *Id*.

The plaintiff filled out a sick call request on January 4, 2006, complaining of, among other things, neck and back pain after sitting for about thirty minutes.  *Id*. at p. 118.  He was examined on January 6, 2006, by the medical staff.  They noted tenderness in his cervical and lumbar vertebrae, his limited range of head motion, and his back pain.  *Id*.  He was prescribed a muscle relaxant.  *Id*.

The plaintiff was again examined by Bosserman in the chronic care clinic on January 23, 2006.  Bosserman noted that the plaintiff could remove his shoes without evidence of pain or any apparent impairment.  *Id*. at p. 14.  Bosserman renewed the plaintiff's restrictive work profile for six more months.  The profile included sleeping in a bottom bunk, no lifting greater than ten pounds and no repetitive stooping or bending.  *Id*.

On March 14, 2006, the plaintiff submitted a sick call request to see Bosserman regarding his back and neck pain.  (Am. Comp. at p. 14).  The sick call was cancelled that day and he was forced to wait nineteen days for the requested response.  *Id*. at p. 14.

The plaintiff was next seen in the chronic care clinic on April 11, 2006.  At this time, the

plaintiff was complaining that the Tylenol that had previously been prescribed was not helping with his pain.  (Doc. 20 at p. 13).  He was continued on his medications.  *Id*.

On May 8, 2006, the plaintiff waited for several hours for his chronic care appointment with Nurse Shala only to ultimately be told the appointment had been cancelled and would be rescheduled later.[10]  (Doc. 8 at p. 16).  The plaintiff maintains that the defendants cancelled and rescheduled numerous appointments "for the sole purpose of retaliation and preventing Talley from receiving adequate health care [for] his serious medical needs."  *Id*. at pp. 17-18.  He also notes that Berry did not promptly dispose of the grievance he filed concerning this incident.  *Id*.

According to the plaintiff, he was examined by Bosserman on May 9, 2006, after he sent a letter to Warden Wise requesting his assistance in receiving medical care.[11]  (Am. Comp. at pp. 14-15).  He was informed by Bosserman that "the only way he would receive a M.R.I. or be referred to a neurosurgeon was if he had [B]lue [C]ross [B]lue [S]hield. Insurance."  *Id*. at p. 15.

On June 15, 2006, the medical staff examined the plaintiff in the chronic care clinic for complaints about neck and back pain.  (Doc. 20 at p. 9).  He was continued on his medications, which included percogesic and aspirin for the pain.  *Id*.

In July 2006, the plaintiff was sent to Carraway Medical Center for a consultation with Dr. Ralph Lyerly, an oncologist, about a problem he was having in his neck.  (Am. Comp. at p. 19).  Lyerly recommended the plaintiff undergo an upper G.I. test which was to be done within about two weeks.  *Id*.  When the plaintiff was not returned to Carraway Medical Center for the tests as expected, he filed various grievances.  *Id*. at pp. 19-20.

---

[10]The plaintiff suffers from diabetes and hypertension for which he is seen in the chronic care clinic.  (Doc. 20).

[11]The medical records before the Court do not reflect this visit.  For purposes of the pending motions, the plaintiff's allegations are accepted.  The records reflect various other visits about this time.

The test was performed before his grievances were responded to. *Id*. at p. 20. After the tests were performed, the plaintiff filed another grievance because Bosserman did not review the results with him. *Id*. at p. 21.

On August 2, 2006, the plaintiff was seen by the medical staff after he completed a sick call request form. He was again complaining about severe neck and back pain. He was seen two days later. He complained that the medications, percogesic and aspirin, were not working. (Doc. 20, Medical Records at p. 116). The plaintiff was referred to the prison physician. *Id*.

The plaintiff was seen by Bosserman two days later. He renewed the plaintiff's restrictive work profile for six additional months. *Id*. at 50. He diagnosed the plaintiff as having "degenerative disc. [sic] disease in [the] neck and back." *Id*. at p. 50.

On September 14, 2006, the plaintiff was examined by Dr. Marc Sonnier. Prior to the examination, the plaintiff asserts that Nurse Berry had him step out of the room and she told Dr. Sonnier that the plaintiff liked to file a lot of grievances. (Doc. 8 at p. 23). Because of this, Dr. Sonnier became "very aggressive and hostile toward Talley and then slung his shoes and socks across the room." *Id*. The plaintiff complains that Dr. Sonnier was unnecessarily rough during the testing of his reflexes, verbally abusive, and ignored his medical needs. *Id*. at pp. 23-24. Specifically, the plaintiff alleges that Sonnier "viciously stab[bed] Talley on his middle toes on both feet with a 14 gauge needle." *Id*. at p. 23. Additionally, he states that Sonnier excessively struck his feet with a rubber hammer, causing excessive pain, and he "viciously slammed [his legs] on the table." *Id*. at p. 24. Finally, he asserts that Sonnier "then told Officer Cooley to get this pile of shit out of my office." *Id*. According to the plaintiff, Dr. Sonnier and Nurse Berry conspired to inflict physical and mental pain on him because he had utilized the

grievance process.  *Id*.

The medical records show that on September 15, 2006, Sonnier requested a radiological study on the plaintiff after he complained of right shoulder pain.  (Doc. 20, Medial Records at pp. 86, 220).  On September 20, 2006, a board certified radiologist performed the study on the plaintiff's right shoulder, cervical spine, and lumbar spine as requested.  The study yielded negative results for the shoulder and slight or mild degenerative changes to the cervical and lumbar spine.  *Id*.  His medications were also renewed on the same date.  *Id*. at p. 86.

On September 20, 2006, the plaintiff was transferred to Hamilton A&I.  (Doc. 8 at p. 25).

The plaintiff filed this lawsuit on October 6, 2006.  (Doc. 1).

The progress notes from the plaintiff's December 6, 2006 visit show once again that the plaintiff suffers from degenerative disc disease.  (Doc. 20, Medical Records at p. 98).

In early 2007, the plaintiff was transferred back to LCF.  The medical staff renewed his restrictive work profile on February 21, 2007.  *Id*. at p. 44.

The essence of the plaintiff's medical complaint is that he (1) has not been given the pain medication he wants, (2) has not been referred to a neurosurgeon, and (3) has not been given an MRI.  (Doc. 8).  The plaintiff further contends that the failure or refusal of the defendants to provide the requested treatment is evidence of inadequate medical treatment for his serious medical needs.  *Id*.  Additionally, his allegations concern his purported need to be classified for a "no work" profile.  *Id*.  Finally, he asserts that he has been harassed and retaliated against.  *Id*. at pp. 23-24; Doc. 14 at p. 2.

### 3.  Inadequate Medical Care

### a.  The Law[12]

In order to establish liability under § 1983 for inadequate medical treatment, a prisoner must show that a failure to provide medical treatment amounted to cruel and unusual treatment in violation of the Eighth Amendment.  The United States Supreme Court has held that it is only "deliberate indifference to serious medical needs of prisoners which will give rise to a claim of cruel and unusual punishment in violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97 (1976).  "Medical treatment violates the Eighth Amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991), *quoting Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).  The conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983.  *Bass v. Sullivan*, 550 F.2d 229 (5th Cir.), *cert. denied*, 434 U.S. 864 (1977).  Mere negligence is insufficient to support a constitutional claim.  *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979).  As stated by the *Estelle* Court, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." 429 U.S. at 106.  Therefore, an accidental or inadvertent failure to provide medical care or negligent diagnosis or treatment of a medical condition does not constitute a wrong under the

---

[12]The plaintiff does not distinguish between whether the claims are filed against the defendants in their official or individual capacities.  To the extent the claims are brought against state defendants in their official capacities, they are due to be dismissed because those defendants are immune from suit.  *See Harbert Intern., Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) ("The state need not be formally named as a defendant for the [Eleventh Amendment] to apply; state officials sued in their official capacity are also protected by the amendment.").  Although the defendants in this case are not state officials, they are performing a function traditionally within the province of the state.  Accordingly, they are due to be treated as a governmental entity to the extent that they are sued in an official capacity.  *See Edwards v. Alabama Department of Corrections*, 81 F. Supp. 2d 1242, 1245 (M.D. Ala. 2000).

Eighth Amendment. *See Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981). Likewise, the disagreement between two doctors, as to the course of treatment, also does not state a violation of the Eighth Amendment, since there may be several acceptable ways to treat a medical condition. *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990).

In *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986), the Eleventh Circuit held that an inmate's dissatisfaction with the medical treatment provided by the prison did not constitute a violation of the Eighth Amendment as long as the treatment provided did not amount to deliberate indifference. The Eighth Amendment is implicated only when the prison doctors or guards intentionally and deliberately deny or delay access to medical attention to serious medical conditions. *Barfield v. Brierton*, 883 F.2d 923, 938 (11th Cir. 1989). Two components must be evaluated to determine whether the plaintiff has been subjected to cruel and unusual punishment. "First, [the court] must evaluate whether there was evidence of a serious medical need; if so, [it] must consider whether [the defendants'] response to that need amounted to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989).

Clearly, "not every injury or illness invokes the constitutional protection only those that are 'serious' have that effect." *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1081 (3d Cir. 1976). Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). In *Estelle,* the Court recognized that medical needs constitutionally requiring medical attention ranged from

"the worst cases," producing "physical 'torture or a lingering death,'" to "less serious cases," resulting from the "denial of medical care," which could cause "pain and suffering." *Estelle*, 429 U.S. at 103. A "serious" medical need has been defined as "one that has either been diagnosed by a physician as mandating medical treatment or one that is so obvious that even a lay person would recognize the need for a doctor's attention." *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977). *See also Page v. Sharpe*, 487 F.2d 567, 569 (1st Cir. 1973). It is the necessity and not the desirability of medical treatment sought which is important to the determination of whether medical officials have exhibited deliberate indifference. *Woodall v. Foti*, 648 F.2d 268 (5th Cir. 1981).

### b.  Analysis

It is undisputed that the plaintiff has a variety of medical conditions, problems, and complaints. Assuming for purposes of summary judgment that they can be considered serious medical needs,[13] the only question remaining is whether the defendants were deliberately indifferent to his medical needs. The defendants assert that the plaintiff cannot demonstrate that they acted with the requisite intent. (Doc. 20 at pp. 18-19). They offer individual affidavits and medical records in support of their special report.

Bosserman examined the plaintiff on numerous occasions while he was at LCF and stated by affidavit that, in his professional judgment, there was no neurological basis for ordering an MRI on the plaintiff, nor any neurological basis for escalating the level of treatment provided him. (Doc. 20, Bosserman Aff.).[14] Bosserman also examined the plaintiff's feet in the diabetic

---

[13]The Court notes that the defendants do not concede this point in their special report. To the contrary, they assert that the plaintiff cannot demonstrate a serious medical need in this instance. (Doc. 20 at pp. 16-18).

[14]Bosserman's affidavit is located at document 20-8 in the Court's electronic file.

clinic.  This examination "verified that there was no nerve damage in his back, which would have manifested in his feet at the clinic."  *Id*. at p. 2.

In September 2006, the plaintiff was examined by Dr. Sonnier who reports that his examination revealed no significant neurological abnormalities.  (Doc. 20, Sonnier Aff.).[15] Sonnier ordered an X-ray study of the plaintiff's cervical, lumbar, and sacral spinal regions, and an X-ray of his right shoulder, in order to evaluate the source of his pain.  *Id*.  Sonnier's interpretation of the X-rays did not reveal a source for the pain.  *Id*.  Sonnier was likewise of the opinion that there was no need for the plaintiff to have a "no work" profile, and no medical reason why he could not work under the restrictions already given to him.  *Id*.

The plaintiff has been examined by nurses and doctors, treated with both prescription and over-the-counter medications for his various conditions and complaints, has been referred to outside specialists, and has had numerous X-rays.  The affidavits of the defendants and the copies of the medical records submitted to the Court clearly show that the plaintiff has received adequate medical care and that his demands for other treatment in the form of specific drugs, additional tests, and referrals to a neurosurgeon are not evidence of inadequate medical care.

A difference of opinion between an inmate and the institution's medical staff as to treatment and diagnosis alone does not give rise to a cause of action under the Eighth Amendment.  *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976); *see also Estelle v. Gamble*, 429 U.S. at 106-08.  Likewise, the question of whether an X-ray - or additional diagnostic techniques or forms of treatment - is indicated is a classic example of a matter for medical judgment.  *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995).  A medical decision not to order

---

[15]Sonnier's affidavit is located at document 20-8 in the Court's electronic file.

an X-ray, an MRI, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice, and, as such, the proper forum is the state court.  *Estelle*, 429 U.S. at 107.

The facts, as described by the plaintiff, simply do not amount to a violation of the Eighth Amendment.  The volume and content of the medical records and the frequency of the plaintiff's medical visits contradict his subjective opinion that the doctors and nurses purposefully ignored or failed to respond reasonably to his pain or medical needs.  "At best, [the plaintiff's] allegations state a difference in opinion between himself and his doctors or allege a mistake in classification or treatment.  Neither differences of opinion nor medical malpractice state an actionable Constitutional violation."  *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002).  A plaintiff who alleges no more than his disagreement with the course of treatment provided to him does not demonstrate an Eighth Amendment violation.  Inasmuch as the plaintiff has failed to dispute with specific facts, the statements in the defendants' affidavits, the defendants are entitled to summary judgment on the plaintiff's claim that the defendants were deliberately indifferent to his medical needs and he was denied adequate medical care while incarcerated at the Limestone Correctional Facility.

Even attributing the purported statements made by various staff personnel as alleged by the plaintiff, the Court remains convinced that the defendants' motion is due to be granted. These statements simply do not demonstrate sufficient deliberate indifference to overcome the medical treatment afforded the plaintiff in the present situation.

### 4. Delayed Medical Care

Throughout his amended complaint, the plaintiff claims that his constitutional rights have been violated when he was not examined by a doctor more quickly, given medication at the time

18

he requested it, or provided additional treatment at his request.

### a.  The Law

Courts have said that mere delay does not constitute a cognizable claim unless it also results in "substantial harm."  *See Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993) (citing *Shapley v. Nevada Bd. of State Prisoner Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)).  To succeed on a claim "that delay in medical treatment rose to a constitutional violation," an inmate "must place verifying medical evidence in the record to establish the detrimental effect of [the] delay in medical treatment."  *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1188 (11th Cir. 1994).  *See also Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991); *Martin v. Tyson*, 845 F.2d 1451, 1458 (7th Cir.), *cert. denied*, 488 U.S. 863 (1988).  It is clear that "[s]ome delay in rendering medical treatment may be tolerable depending on the nature of the medical need and the reason for the delay."  *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995).  It is only when "delay in access to medical care . . . is 'tantamount to "unnecessary and wanton infliction of pain,'" [that it] may constitute deliberate indifference to a prisoner's serious medical needs."  *Id.* (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir.), *cert. denied*, 496 U.S. 928 (1990)).

### b.  Analysis

The plaintiff has not placed any verifying medical evidence in the record to demonstrate the harmful effects, if any, attributable to the delay in treatment.  The timeliness and adequacy of the medical care that was provided clearly did not satisfy the plaintiff, but that is not the measure to be applied in assessing whether error of constitutional dimension occurred.  Thus, the plaintiff has not alleged a constitutional violation, and the defendants are entitled to summary judgment

on the plaintiff's claim that his constitutional rights were violated when he did not receive

immediate medical treatment or when medical appointments were cancelled and rescheduled.

### 5.  Work Profile

The plaintiff also complains that the defendants have violated his constitutional rights by

refusing to renew his "no work" profile.  On April 16, 2004, soon after the beginning of his

incarceration and prior to the motor vehicle accident, Dr. Hammer gave the plaintiff a six month

"no work" profile.  Bosserman renewed that profile on January 20, 2005.  On July 18, 2005, the

plaintiff saw Bosserman in the Health Care Unit to have the "no work" profile renewed again,

but Bosserman discontinued the plaintiff's "no work" profile.  *Id*. at p. 7.  Bosserman counseled

the plaintiff that he should expect some neck discomfort due to his prior surgery and some

arthritic changes.  He also continued percogesic medications for pain.  (Doc. 20, Medical

Records at p. 105).  He further continued the plaintiff's restricted work profile but did not give

him a "no work" profile.  Comments on the Special Needs Communication Form were as

follows:

> Bottom Bunk
> No repetitive stooping or bending,
> No lifting greater than 10 lbs
> Dx: Degenerative Disc disease, neck and back w/surgery on neck
> (once) and back (twice)

(*Id*. at p. 56).[16]  The plaintiff maintains that his work status was changed as a means of

punishment for seeking medical care.

In response to the plaintiff's complaint, Bosserman made the following statement:

---

[16]These restrictions have been renewed every six months by one of the doctors, the most recent being
February 21, 2007.  (Doc. 20 at p. 44).

Limestone Correctional Facility is a working prison.  However, it has many light duty positions, such as chaplain's assistant and hall monitor.  There is no medical reason why Talley could not work at one of these jobs under the restrictions given to him by me.  His medical condition did not warrant a "No Work Profile."

(Doc. 20, Bosserman Aff. at ¶ 9).

The plaintiff has failed to put forth any facts to support his claim that his work status was changed because he requested medical care or that he has a constitutional right to a "no work" profile which defendants have violated.  The nature of work to which a prisoner is assigned is a matter of prison administration which is within the discretion of prison officials.  *Altizer v. Paderick*, 569 F.2d 812 (4th Cir.), *cert. denied*, 435 U.S. 1009 (1978).  The plaintiff's complaint fails to state a claim of constitutional proportion and is due to be dismissed.

### 6.  Verbal Harassment

It is well-established that allegations of verbal abuse and threats, as well as threatening gestures and conduct by correctional officers and officials, are insufficient grounds for relief under § 1983.  *See Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (verbal threats or abuse do not rise to the level of constitutional violations cognizable under § 1983); *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) (allegations of verbal threats and name calling do not amount to constitutional violations actionable under § 1983).  Accordingly, the plaintiff's allegations claim that he was verbally abused because he had filed previous medical grievances is due to be dismissed for failure to state a claim.

### 7.  Prison Health Services

The plaintiff names Prison Health Services, Inc. ("PHS"), the medical care provider for Alabama prisons, as a defendant.  PHS retorts that this matter is due to be dismissed as to it

21

because it is functioning in a traditionally state matter.  (Doc. 20 at p. 19).  PHS further alleges

that it is due to be dismissed from this action because it cannot be held liable under § 1983 for

the actions of its subordinates under a *respondeat superior* theory.  *Id*. at p. 20.

While a corporation providing prison medical services may be liable under § 1983 if it is

established that the constitutional violation was the result of the corporation's policy or custom,

*see Buckner v. Toro*, 116 F.3d 450 (11th Cir. 1997); *Ort v. Pinchback*, 786 F.2d 1105, 1107 (11th

Cir. 1986), such a corporation may not be held liable under § 1983 on the basis of *respondeat*

*superior*, *see Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992); *Monell v. Department*

*of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  The plaintiff has not

alleged that any policy or custom of PHS contributed in any way to the claimed constitutional

violation.  Consequently, summary judgment should be granted in favor of PHS and the

corporation should be dismissed from this action.

### 8.  Americans with Disabilities Act

The plaintiff claims that his rights under the Americans with Disabilities Act ("the

ADA"), 42 U.S.C. §§ 12131-12165, have been violated, but offers no details to support this

claim.  The Supreme Court has concluded that the ADA is applicable to prisoners in state

institutions.  *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998).

The ADA prohibits the exclusion of a "qualified individual with a disability" from

participation in "the benefits of the services, programs, or activities of a public entity" by reason

of such disability.  42 U.S.C. § 12132.  In order to state a claim of disability discrimination under

Title II of the ADA, the plaintiff must allege four elements: "(1) he is an individual with a

disability; (2) he is otherwise qualified to participate in or receive the benefit of some public

entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services . . . or was otherwise discriminated against by the public entity; and (4) such exclusion, denial . . . or discrimination was by reason of his disability." *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (citation and internal quotation marks omitted).  To recover monetary damages under Title II of the ADA, the plaintiff must establish intentional discrimination on the part of the state officials.  *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998).

Assuming for purposes of summary judgment that the plaintiff is disabled and is qualified to receive the benefits of prison medical services, the plaintiff does not claim that he was treated worse *because* he is disabled.  The plaintiff complains only about medical decisions.  At most his complaints are of negligence or incompetence.  A claim for negligent medical treatment for a disability is not actionable under the ADA and the ADA does not create a remedy for medical malpractice.  *See Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996).

The plaintiff must also allege and show that he was denied benefits he was "otherwise qualified for" "solely by reason of disability."  *See, e.g., Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir. 1992), *cert. denied*, 507 U.S. 910 (1993).  As to whether treatment was denied "solely" by reason of disability, the Second Circuit has stated: "Where the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say . . . that a particular decision was 'discriminatory.'"  *United States v. University Hospital*, 729 F.2d 144, 157 (2d Cir. 1984).

It is treatment for his alleged disability that the plaintiff complains about in this case. These are the sort of purely medical decisions that do not ordinarily fall within the scope of the

23

ADA.  The plaintiff's claims against the physicians and nurses at LCF relate only to the refusal

of those defendants to exercise their professional judgment in accordance with the plaintiff's

view of his medical needs.  His claim that his rights under the ADA have been violated is due to

be **DISMISSED** on the motion for summary judgment.

## III.  CONCLUSION

Accordingly, for the reasons stated above, the Court finds that the defendants' special

report should be treated as a motion for summary judgment and, as such, granted and this action

be dismissed with prejudice.  The Court further finds that the plaintiff's motions (1) to amend his

pleadings and add a claim that the defendants did not implement the medical treatment

recommended by Dr. Lyerly on August 24, 2006, for helilobalter pylroi (doc. 12);[17] (2) to amend

his pleadings to add "Nurse Brown and Nurse Smith" due to their purported failure to report Dr.

Sonnier's "unprofessional and vicious actions which were inflicted upon the plaintiff;" (doc. 13);

(3) to correct an error in the Court's understanding of his claims and to enumerate his harassment

and retaliation claims (doc. 14); (4) seeking to prevent his transfer to another institution and

requesting that he be provided "outside" medical care only (doc. 15); (5) to be placed and remain

on "no work status;" (doc. 16); (6) to stay this action until the Court orders the production of

additional medical records (doc. 28); (7) to stay this action until the plaintiff has an independent

physical examination (doc. 30); and (8) to stay this action until the defendants produce additional

medical records (doc. 32) are all due to be denied.[18]

---

[17]Accepting the plaintiff's allegations as true, which the Court must do at this juncture, the Court still finds this to be insufficient to over come the defendants' showing regarding the medical care provided to the plaintiff during the relevant period.

[18]To the extent any of the plaintiff's motions seek to add new claims or defendants, the Court has considered his allegations and still finds that they do not amount to constitutional violations or other civil claims sufficient to overcome the special report of the defendants that the Court is deeming a motion for summary judgment.

The Clerk is **DIRECTED** to serve a copy of this memorandum opinion upon the plaintiff and upon counsel for the defendants.

**DONE**, this the 26th day of November, 2007.

_____

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**